IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| SUMMER DAWN ROSE, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) Civil Action No. 06-565 |
| | ) |
| MICHAEL J. ASTRUE, | ) |
| Commissioner of Social Security, | ) |
| | ) |
| Defendant. | ) |

**MEMORANDUM OPINION**

**I.   INTRODUCTION**

Pending before the Court are cross-motions for summary judgment filed by Plaintiff Summer Dawn Rose, by and through her mother, Jeannie Ross, and Defendant Michael J. Astrue, Commissioner of Social Security.[1]  Plaintiff seeks review of a final decision of the Commissioner denying her claim for Supplemental Security Income benefits ("SSI") under Title XVI of the Social Security Act, 42 U.S.C. §§ 1381, *et seq.*   For the reasons discussed below, Plaintiff's motion is denied and Defendant's motion is granted.

---

[1]   Pursuant to Fed. R. Civ. P. 23(d)(1), Michael J. Astrue, who became Commissioner of Social Security on February 12, 2007, is substituted for Jo Anne B. Barnhart in this action; *see also* 42 U.S.C. § 405(g) ("Any action instituted in accordance with this subsection shall survive notwithstanding any change in the person occupying the office of Commissioner of Social Security or any vacancy in such office.")

## II. BACKGROUND

### A. Factual Background

Summer Rose ("Summer") was born on September 17, 1996. As an infant, she began experiencing chronic nosebleeds for no obvious reason and was diagnosed with von Willebrand's disease, a genetic condition which diminishes the body's blood clotting ability.[2] Because injuries could cause severe internal or external bleeding, Summer's mother rigorously limited the types of physical activities she was allowed to pursue. Although she was not repeatedly admitted to the hospital, she remained closely under a doctor's care.

Summer entered kindergarten in the fall of 2001, where she earned grades of A and B in most subjects, but could not identify rhyming words and had difficulty recognizing and printing numbers one through ten. In April 2002, she received grade-equivalent scores on the Iowa Tests of Basic Skills of K-8 in reading and K-9 in math. (Certified Copy of Transcript of Proceedings, Docket No. 6, "Tr.," at 182.) She did not receive any speech therapy and was not tested for learning or behavioral problems. (Tr. 131.) She

---

[2] Von Willebrand's disease is the most common hereditary bleeding disorder, caused by the deficiency of a factor which helps blood platelets clump together and stick to the blood vessel wall, a process necessary for normal blood clotting. Although most cases are mild, aspirin and other non-steroidal anti-inflammatory drugs can make this condition worse. Medications such as desamino-8-arginine vasopressin ("DDAVP") can be given to reduce the tendency toward bleeding. See www.nlm.nih.gov/medlineplus, last visited April 20, 2007.

was frequently absent, due at least in part to her ill health.

When Summer entered first grade, she began to receive speech therapy once a week for half an hour. (Tr. 165.) Because her illness caused her to miss an excessive number of school days, her pediatrician requested homebound instruction. As of November 6, 2002, Summer attended school half-days and received five hours of home instruction each week through the end of the 2002-2003 school year. (Tr. 181.)

In January 2003, Summer began receiving weekly psychological counseling from ACS, Inc. (Tr. 374.) Her therapist indicated that Summer had difficulty with listening skills and following directions. (Id.) Summer only attended four such sessions before treatment was terminated by her mother. (Tr. 372.) After she began treatment again in October 2003, her psychiatrist, Dr. Manuel Reich, signed off on an assessment which indicated diagnoses of adjustment disorder, mixed disturbance of emotions and conduct, attention deficit disorder without hyperactivity, and a reading disorder, NOS. (Tr. 372-373.)

Because Summer had not made sufficient academic progress due to her illnesses and absences from school, it was determined that she would repeat first grade. She continued to receive speech therapy and learning support through an Individualized Education Plan ("IEP") in addition to her regular classroom work. These supports continued through second grade, and in June 2005 Summer

3

was promoted to third grade with a low B average and an 86%
attendance rate.  (Tr. 249.)

B.    Procedural Background

On May 20, 2002, Ms. Ross filed an application for SSI on
Summer's behalf, claiming disability due to von Willebrand's
disease and a deformed left scapula.  After the application was
denied, a hearing was held on January 10, 2003, before the
Honorable Randall W. Moon, Administrative Law Judge ("ALJ.")  (Tr.
69.)  Judge Moon also denied benefits in a decision dated January
30, 2003, and, it appears from the record, this decision was not
appealed to either the Social Security Appeals Council or to the
district court.

Plaintiff again filed for SSI benefits on April 29, 2003; this
application was denied on September 22, 2003.  (Tr. 88-91.)  A
third application claiming disability due to depression, attention
deficit disorder and von Willebrand's disease was filed on March
17, 2004, and denied on October 27, 2004 (Tr. 92-96), after which
Plaintiff timely filed for a hearing before an ALJ.

On September 13, 2005, a hearing was held before Judge Moon
at which both Summer and her mother testified.  Judge Moon issued
his decision on November 1, 2005, again denying benefits.  (Tr. 14-
20.)  The Appeals Council declined to review the ALJ's decision on
March 1, 2006, finding no error of law or abuse of discretion and
concluding the decision was based on substantial evidence to

4

support his findings. (Tr. 4-6.) Therefore, the November 1, 2005 opinion of the ALJ became the final decision of the Commissioner for purposes of review. 42 U.S.C. § 405(h); Rutherford v. Barnhart, 399 F.3d 546, 549-550 (3d Cir. 2005), citing Sims v. Apfel, 530 U.S. 103, 107 (2000). Plaintiff filed suit in this Court on April 28, 2006, seeking judicial review of the ALJ's decision.

C. Jurisdiction

This Court has jurisdiction by virtue of 42 U.S.C. § 1383(c)(3) (incorporating 42 U.S.C. § 405(g)) which provides that an individual may obtain judicial review of any final decision of the Commissioner by bringing a civil action in the district court of the United States for the judicial district in which the plaintiff resides.

III. STANDARD OF REVIEW

The scope of review by this Court is limited to determining whether the Commissioner applied the correct legal standards and whether the record, as a whole, contains substantial evidence to support the Commissioner's findings of fact. 42 U.S.C. § 405(g); Richardson v. Perales, 402 U.S. 389 (1971); Schaudeck v. Comm'r of Soc. Sec. Admin., 181 F.3d 429, 431 (3d Cir. 1999). Findings of fact by the Commissioner are considered conclusive if they are supported by "substantial evidence," a standard which has been described as requiring more than a "mere scintilla" of evidence,

5

that is, "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson, id. at 401. "A single piece of evidence will not satisfy the substantiality test if the [ALJ] ignores, or fails to resolve, a conflict created by countervailing evidence." Kent v. Schweiker, 710 F.2d 110, 114 (3d Cir. 1983).

This Court does not undertake de novo review of the decision and does not re-weigh the evidence presented to the Commissioner. Schoengarth v. Barnhart, 416 F. Supp.2d 260, 265 (D. Del. 2006), citing Monsour Medical Center v. Heckler, 806 F.2d 1185, 1190 (3d Cir. 1986) (the substantial evidence standard is deferential, including deference to inferences drawn from the facts if they, in turn, are supported by substantial evidence.) If the decision is supported by substantial evidence, the Court must affirm the decision, even if the record contains evidence which would support a contrary conclusion. Panetis v. Barnhart, CA No. 03-3416, 2004 U.S. App. LEXIS 8159, *3 (3d Cir. Apr. 26, 2004), citing Simmonds v. Heckler, 807 F.2d 54, 58 (3rd Cir. 1986), and Sykes v. Apfel, 228 F.3d 259, 262 (3rd Cir. 2000).

## IV. **LEGAL ANALYSIS**

### A.   The ALJ's Determination

In disability cases involving children under the age of 18, the child must establish that she has a "medically determinable physical or mental impairment, which results in marked and severe

6

functional limitations, and which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 1382c(a)(3)(C)(i). The process used by the ALJ to determine if the claimant satisfies the criteria for receiving Supplemental Security Income benefits is modified from that used in adult disability cases. To determine the eligibility of a child claimant, the ALJ considers three steps:

- (1) Is the child engaged in substantial gainful activity? If so, she is not disabled.

- (2) Does the child have an impairment (or combination of impairments) which is "severe" as that term is defined in Social Security regulations? If the impairment is not severe,[3] the child is not disabled.

- (3) Does the impairment (or combination of impairments) meet, medically equal or functionally equal the criteria for an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 ("the Listings")? If so, the child is disabled.

20 C.F.R. § 416.924(a); see also Moreno v. Comm'r of Soc. Sec., No. 05-4771, 2006 U.S. App.LEXIS 24608, *2-*3 (3d Cir. Sept. 29, 2006).

In the third step, the ALJ compares the impairment(s) to the Listings and can usually readily determine if the medical evidence shows that the child's condition satisfies or "medically equals" the criteria for a particular Listing. However, in determining whether the impairments "functionally equal" a Listing, the ALJ

---

[3] An impairment is "not severe" if it is only "a slight abnormality or a combination of slight abnormalities that causes no more than minimal functional limitations." 20 C.F.R. § 416.924(c).

7

must consider the child's abilities, as compared to those of other children her age, in six domains:

    (1)   acquiring and using information;

    (2)   attending and completing tasks;

    (3)   interacting and relating with others;

    (4)   moving about and manipulating objects;

    (5)   caring for oneself; and

    (6)   health and physical well-being.

20 C.F.R. § 416.926a(b)(1).

To satisfy the "functionally equal" alternative, the child must demonstrate either a "marked" limitation in two domains of functioning or an "extreme" limitation in at least one domain. 20 C.F.R. § 416.926a(a) and (d). A "marked" limitation exists when the impairment interferes "seriously" with the child's ability to "independently initiate, sustain, or complete activities" and an "extreme" limitation exists when the impairment interferes "very seriously" with that ability. 20 C.F.R. §§ 416.926a(e)(2)(i) and (e)(3)(i), respectively.

To determine if a child's impairments functionally equal the listings, the ALJ assesses what the child cannot do, has difficulty doing, needs help doing, or is restricted from doing because of her impairment(s). The functional equivalence determination is based on the "interactive and cumulative effects" of all the impairments for which there is evidence in the record, including those which

8

are non-severe.   See 20 C.F.R. § 416.924(c). The ALJ considers

relevant factors such as the child's ability to initiate and

sustain activities, whether extra help is needed and the  effects

of structured or supportive settings; how the child functions in

school; and the effects of medication or other treatments.   20

C.F.R. § 416.926a(a) and § 416.924a(b).

Following the prescribed analysis, Judge Moon first concluded

that Summer, who was in the third grade and within a few days of

her ninth birthday at the time of the hearing, had not engaged in

substantial gainful activity. (Tr. 15.) At step two, he concluded

that Summer's attention deficit/hyperactivity disorder ("ADHD"),

von Willebrand's disease, irritable bowel syndrome, depression,

learning disability, and speech impairment were severe inasmuch as

they were more than slight abnormalities and caused more than

minimal functional limitations.   (Tr. 15.)

At step three of the analysis, Judge Moon concluded that none

of Summer's impairments met or medically equaled the criteria of

any of the Listings.  He explicitly considered Listing 112.11 in

evaluating her attention deficit/hyperactivity disorder and

concluded that the medical reports failed to establish that she

demonstrated marked inattention, marked impulsiveness or marked

hyperactivity. (Tr. 15.)  He determined that her speech impairment

did not satisfy the criteria of Listing 112.12.[4]   As to her
depression, the ALJ determined that she did not satisfy Listing
112.04A or B (mood disorders) and that her medical records showed
a history of non-compliance with regard to her medication usage.
(Id.)  Her educational progress, as shown in her final second-grade
report card, indicated she did not satisfy Listing 112.05 (mental
retardation) or 112.02 (organic mental disorders).[5]

     Judge Moon then considered whether any of the impairments were
functionally equivalent to a Listing, concluding that they were
not.   Citing to the evaluations by Summer's teachers, her report
cards,   the   reports   of   consultative   and   long-term   treating
physicians and psychologists, and the testimony received at the
hearing from Summer and her mother, the ALJ concluded that the
record failed to establish a marked or extreme limitation in any of
the six domains.  (Tr. 17-18.)  Thus, he concluded that Summer was
not disabled and therefore not eligible to receive Supplemental
Security Income payments.  (Tr. 19.)

B.   Plaintiff's Arguments

     Summer raises only a single argument in her brief in

---

[4]   The Court questions the applicability of Listing 112.12 to
Summer's speech impairment inasmuch as that Listing concerns
development and emotional disorders of newborn and younger infants
(birth to age 1.)   However, Plaintiff does not question the ALJ's
conclusion that Summer's speech impairment, while severe, does not
satisfy any listing.

[5]   As discussed in more detail below, the ALJ made no explicit
findings as to whether Summer's von Willebrand's disease or irritable
bowel syndrome satisfied or medically equaled any Listing.

10

support of the motion for summary judgment, that is, the ALJ's conclusion that she is not disabled is not supported by substantial evidence.   (Brief in Support of Plaintiff's Motion for Summary Judgment, Doc. No. 10, "Plf.'s Brief," at 9.)   Specifically, she argues that the ALJ erred by finding that she has less than marked limitation in three of the six domains:   acquiring and using information; attending and completing tasks; and health and physical well-being.   (Id. at 12.)

       1.   *The ALJ erred in finding that Summer showed less than marked limitation in acquiring and using information:*   In reaching the conclusion that Summer showed less than marked limitation in the domain of acquiring and using information, the ALJ considered Ms. Ross's testimony that Summer had difficulty reading and with cursive writing, Summer's second-grade report card reflecting an overall B average; her IEP evaluation from May 2005 indicating that her oral reading was "adequate;" and a teacher's evaluation from October 15, 2004, stating she had only "slight difficulty" comprehending math problems and written material, had no problem understanding and participating in class discussions, and was able to apply problem-solving skills.   (Tr. 17.)

     Plaintiff argues that the ALJ erred in evaluating this domain, pointing to the fact that she has a speech impairment for which she receives on-going therapy; she was required to repeat first grade because of excessive absences and was home-schooled from November

11

2003 through May 2004; her teachers have pointed out several basic learning skills (i.e., visual short term memory and perception, basic reading skills, phonological awareness of letter-sound relationships, answering comprehensive questions, simple eye-hand coordination skills, visual and auditory attentive behaviors, and attendance) which need to be improved, and the fact that the IEP team recommended seven additional hours per week of learning support for her.   Plaintiff's contention is that the fact she missed so much school due to illness in first grade and required home-schooling for several months is "sufficient to form a basis for a finding of a 'marked' limitation" in this domain. (Plf.'s Brief at 13.)

In the domain of acquiring and using information, an ALJ is to consider how well a child reads, writes, does arithmetic, and understands and uses new information as compared to others in her own age group and developmental stage. A child age 6 to 12 should be able to read, write, do math and discuss history and science. She should be able to use these skills in daily living situations at home, e.g., reading street signs, telling time, and making change. She should use increasingly complex vocabulary and grammar to share information and ideas with others by asking questions and expressing her own ideas and by responding to the opinions of others. A child in this age range is limited when, for example, she cannot demonstrate understanding of words about space, size or

time, cannot rhyme words or sounds in words, has difficulty recalling important things learned in school the previous day, has difficulty with mathematics, talks only in short simple sentences or has difficulty explaining what she means.    20 C.F.R. § 416.926a(g).

The facts on which Plaintiff relies to argue that she has a marked limitation in her ability to acquire and use information are drawn largely from her kindergarten and first grade experience, before she began to receive speech therapy and additional learning support.    That is, the basic learning skills noted above which needed to be improved were described on May 27, 2004, when teachers were preparing an IEP outline for her learning support goals for the upcoming school year, i.e., as she was about to enter second grade as of August 30, 2004.  (Tr. 162.)  The fact that Summer was receiving special education services or accommodations "does not, in itself, establish. . .actual limitations or abilities."    20 C.F.R. § 416.924a(b)(7).

In a series of intelligence tests given in January 2004, Summer scored 98, or average, on the Wechsler Intelligence Scale for Children, with her working memory score, the lowest, at 86, still within the average range.  (Tr. 164.)  On the Woodcock-Johnson III test, her basic reading skills were scored at 85, slightly below the standard score of 90-109, her broad math skills were at 113 and her academic skills at 95.  (Id.)  On October 14,

13

2005, as she entered second grade, Summer's teacher noted that she had only "slight" problems with acquiring and using information as compared to other children of her age.  (Tr. 214.)   At the end of second grade, Summer's overall assessment in reading and spelling was B and her math grade was A.   (Tr. 250.) The learning support teacher described Summer at that time as pleasant, cooperative, and verbally expressive, noting that she could read adequately with only occasional miscues and tried to decode words she did not know.  (Tr. 232.)   At the hearing, she knew age-appropriate information such as the name of her school and the number of children in her class (Tr. 35-36), and asked appropriate questions such as the meaning of the word "restrictions."  (Tr. 39.)  Although her mother testified that Summer was having difficulty with cursive writing because of her dyslexia (Tr. 53), the Court has been unable to identify any reference to dyslexia in the record.

Similarly, a comment by one of her teachers on which Plaintiff relies, i.e., that only 70% of her speech was intelligible, was made on May 16, 2003, when she was in first grade for the first time.  (Tr. 142.)  Daniel Church, M.D., examined Summer on July 12, 2003, and concluded

> her speech problems seemed to be more related to articulation.  She does not seem to have any problems understanding what is being said.  Her receptive language seems to be completely normal. . . . With continued speech therapy, it is likely that the speech articulation disorder can be resolved.

(Tr. 283.)   Summer continued to receive speech therapy and less

than a year later, Thomas E. Andrews, Ph.D., described Summer's speech as "mildly immature and poorly articulated, but . . . understandable." (Tr. 363, report dated May 13, 2004.) By the time she entered second grade, her teacher noted she was able to understand almost all of Summer's speech on the first attempt, even when she did not know the topic of the conversation. (Tr. 217; report dated October 15, 2004.)

In short, there was substantial evidence, much of it cited by the ALJ in his opinion, from which to conclude that Summer's speech problems were being resolved and her learning disability was not so limiting that she could not perform at average or above average levels for a child of her age. That is, Summer's speech impairment and mild learning disability "did not interfere seriously with the ability to function (based upon age-appropriate expectations) independently, appropriately, effectively, and on a sustained basis." (*See* Listing 112.00.C., Assessment of Severity.) The ALJ's conclusion that Summer did not show a marked limitation in this domain will therefore be affirmed.

2. *The ALJ erred in finding that Summer showed less than marked limitation in attending and completing tasks:* The ALJ noted that in a teacher questionnaire completed on October 15, 2004, Summer was described as having only "slight" problems working without distracting herself or others, completing assignments without careless mistakes, and working at a reasonable pace to

15

complete tasks on time, although she had an obvious problem focusing for a long period of time. (Tr. 17, referring to Tr. 213-220.) He also referred to Dr. Andrews's report that Summer was able to concentrate quite well and showed good pace and persistence. Finally, he noted that during an IEP observation in May 2005, the school guidance counselor indicated that Summer sat quietly, paid attention, acted appropriately, and was on task 90% of the time, behavior which was similar to that of her classmates. (Tr. 17-18.) Therefore, he found that Summer had less than a marked limitation in this domain.

Plaintiff argues that this conclusion was erroneous because of her ADHD diagnosis and her need for learning support services at school. Summer's mother, teacher, and psychiatrists all noted her difficulty concentrating and remaining on task. Her first grade teacher commented on below average or poor classroom behaviors such as remaining on task, completing in-class assignments and homework, leadership skills, and following class/school rules. It was her opinion that Summer was on task only 50% of the time and needed frequent reminders to finish work. Summer's second grade teacher similarly reported difficulty sitting still and staying on task. (Plf.'s Brief at 13-14, *citing* Tr. 183 and 232.)

In considering the domain of attending and completing tasks, the ALJ is to evaluate the child's ability to focus and maintain attention, and how well she begins, carries through, and finishes

16

her activities, including the pace at which she performs activities and the ease with which she changes them.    Attention involves regulating levels of alertness and initiating and maintaining concentration, the ability to filter out distractions and to remain focused on an activity or task at a consistent level of performance long enough to initiate and complete an activity or task.    In assessing the child's ability to maintain attention, the ALJ should also consider her ability to return to a task without reminders from other people if she is interrupted or loses focus.  School age children between 6 and 12 years of age should be able to focus attention well enough to follow directions, remember and organize school materials, and complete classroom and homework assignments. As compared to other non-impaired children of the same age and developmental stage, a school child should be able to concentrate on details and not make careless mistakes in her work;  be able to change activities or routines without distracting herself or others; stay on task and in place when appropriate; and be able to participate in group sports, read by herself, and complete family chores.    Examples of limited functioning in this domain include easy distraction or overreaction to sounds, sights, movements, or touch;    limited ability to focus on, or failure to complete, activities of interest to the child;  repeatedly becoming sidetracked or frequently interrupting others; becoming easily frustrated and giving up on tasks, including those she is capable

17

of completing; and requiring extra supervision to maintain an activity.   20 C.F.R. § 416.926a(h).

Again, many of the inattentive behaviors and perceptions of a learning disability referred to in Plaintiff's brief were observed when Summer was in first grade, on November 6, 2003.   (Tr. 183.) At that time, her main challenge was remaining on task and focusing when completing assignments independently; for instance, she was on task only 50% of the time.   She also needed frequent reminders to finish her work.   (Id.)  By comparison, in the evaluation completed when Summer was in second grade, her teacher noted that she had "obvious" problem[6] focusing long enough to complete assigned tasks and "slight" problems in several other activities.   The teacher further noted that Summer often asked questions and needed reassurance that she was correct.   Teachers gave her prompts, repeated directions, and allowed extra time to help her cope with these problems.   (Tr. 215.)   The IEP team noted at the end of second grade, that Summer had good behavior, and was polite, friendly and eager to please, but found it hard to sit still and stay on task. Her teacher believed Summer "has the potential to do well on her own, but needs more reinforcement, help at home, and test taking support."   (Tr. 232.)   She worked independently and asked for help if she did not understand the material or a

---

[6]  The form asked the teacher to indicate if the child's problem in each of several activities within each domain was slight, obvious, serious, very serious or non-existent.   (Tr. 214-220.)   These terms were not further defined in the evaluation.

18

question.   She was working at grade level in all subjects.   The
school librarian reported that Summer remained in her seat, and was
quiet and polite, but noted interfering behaviors such as a short
attention span, lack of communication skills, difficulty following
directions, and being easily distracted.   In an observation done by
the school guidance counselor on May 5, 2005, during a spelling
class, Summer did well on a test, sat quietly, paid attention, and
acted appropriately, with no observed difference between her and
her peers.   She was on task 90% of the class time.   (Tr. 232.)
Summer participated in class, contributed to discussions, listened
to others, and controlled her behavior and temper, although she
occasionally    needed    help    following    directions,    listening
attentively and making an effort to complete tasks.   She needed to
improve her handwriting, attendance, her independent and oral
reading skills, test taking skills, ability to follow written
instructions and grasping newly presented skills.   (Tr. 233.)   She
was "meeting with success" under the IEP which was recommended to
continue in third grade at the rate of one 35-40 minute learning
support session each school day for additional help in spelling,
reading and test-taking skills.   (Tr. 243.)

Similarly, Plaintiff relies on Dr. Church's report in July
2003 of "possible learning disabilities."    (Tr. 281, 283.)
However, at that point, no psychoeducation and IQ testing had been
done to determine the extent of such a disability.   By contrast,

19

Dr. Andrews's report, prepared almost a year later in May 2004, notes that although in the interview her mother was unable to stop inappropriate behaviors such as constant interrupting, getting up and down, and fidgeting, when Dr. Andrews "set the limit for her, she became quiet and more appropriate." (Tr. 361.) During the interview, Summer was fidgety, but tried hard and performed in an age-appropriate way when presented with tasks such as drawing a house, tree and person. (Tr. 362.) He further noted that "she was a rather active child in the office, but with structuring, was able to focus attention well," showed good judgment, and cooperated well with the drawing tasks. (Id.) In summary, Dr. Andrews concluded she did not appear to have any significant cognitive deficits, "although she might have a mild learning disability for reading and printing." (Tr. 363.) She could concentrate "quite well" and showed good pace and persistence. (Id.)

When Summer was first seen at ACS in January 2003, she (or her mother) complained of difficulty getting along with others, poor concentration and poor attention span. (Tr. 369.) In November 2003 she was described as hyperverbal, with intact thought process. Ms. Ross reported no problems with behavior, impulsivity or violence, although on rare occasions Summer was self-abusive when frustrated and would bang her head. She had fair to poor ability to concentrate, pay attention and stay on task. (Tr. 373.) During an examination in July 2004 by Dr. Leyla Somen, she was described

as hyperactive, fidgety, complaining, hyperverbal and impulsive. (Tr. 370.) She was diagnosed with ADHD and a learning disability. At that time, she was not taking Adderall or Concerta,[7] even though the latter had been prescribed by Dr. Reich the previous December. (Tr. 371.)

At the hearing, Ms. Ross testified that although Summer liked to read books and magazines, she was easily frustrated and wanted her mother to read to her. (Tr. 53.) Ms. Ross also testified that although Summer had "issues" with her teachers about "fidgeting," when she took Adderall as prescribed, her ability to concentrate improved. (Tr. 56.)

To determine if a child's ADHD is the functional equivalent of a Listing, the disability must be medically documented (which it is in this case), and the child must demonstrate marked limitations in at least two of the following categories: (1) age-appropriate cognitive/communicative functioning; (2) age-appropriate social functioning; (3) age appropriate personal functioning; and (4) difficulties in maintaining concentration, persistence, or pace. See Listings 112.11 and 112.02B2. Although Dr. Andrews and Summer's teachers noted that her speech impediment led to some

---

[7] Adderall is a combination of dextroamphetamine and amphetamine, used in the treatment of ADHD. Concerta is the long-lasting, extended release form of methylphenidate, also used in the treatment of ADHD. Both Adderall and Concerta are in a class of medications called central nervous system stimulants which work by changing the amounts of certain natural substances in the brain. See www.nlm.nih.gov/medlineplus, last visited April 20, 2007.

21

limitations in communication, her third-grade teacher was able to understand her 90% of the time and Dr. Andrews noted no cognitive limitations and only immature verbalization. Plaintiff points to no evidence that would indicate that she was limited in her social functioning or personal functioning, and as discussed above, her difficulties in maintaining concentration, persistence or pace varied according to the task at hand and were improved with learning support at school.

Again, there was substantial evidence in the record from which the ALJ could reasonably conclude that although Summer had some learning disabilities and mild attention deficit/hyperactivity disorder, those impairments had improved with speech therapy, relatively low levels of learning support, and medication. Therefore, we conclude that the ALJ did not err in finding Summer's ability in the domain of attending and completing tasks was less than marked.

3. *The ALJ erred in finding that Summer showed less than marked limitation in health and physical well-being*: Judge Moon first noted that von Willebrand's disease caused Summer to bleed easily and restricted her activities in order to avoid injuries. He also noted that she took medication to control irritable bowel syndrome. He concluded however, that these conditions were controlled and that her limitation was less than marked in this domain. (Tr. 18.)

22

Plaintiff argues that the ALJ improperly discounted all the medical evidence of record and relied on his own opinions as to her condition. For instance, he failed to consider the consistently low GAF[8] scores attributed to Plaintiff by Drs. Somen and Reich and failed to recognize Dr. Church's conclusion that von Willebrand's disease in and of itself is disabling. (Plf.'s Brief at 14, *citing* Tr. 286.) Finally, the ALJ failed to recognize the effects of Plaintiff's irritable bowel syndrome for which she takes "a myriad" of medication. As a result of these medical conditions, she was absent from school an extraordinary number of days in first grade, resulting in homebound instruction from November, 2003 through the end of the 2003-2004 school year and having to repeat first grade. (Plf.'s Brief, id.)

In the domain of health and physical well-being, the ALJ considers the cumulative effects of physical or mental impairments and their associated treatments or therapies which may make it

_____

[8] The Global Assessment of Functioning or GAF scale assesses how well an individual can function according to psychological, social, and occupational parameters, with the lowest scores assigned to individuals who are unable care for themselves. Drejka v. Barnhart, CA No. 01-587, 2002 U.S. Dist. LEXIS 7802, *5, n2 (D. Del. Apr. 18, 2002). "A GAF score of 41-50 indicates serious symptoms or serious impairment in social, occupational, or school functioning, such as inability to keep a job." Langley v. Barnhart, 373 F.3d 1116, 1122 n3 (10th Cir. 2004), *quoting* American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders (Text Revision 4th ed. 2000) at 32. The low GAF scores seem to be at odds with the narrative portions of the doctors' reports which describe Summer as having a very pleasant mood, a "very pleasant and full range" affect (Tr. 373), the ability to respond to questions fairly well, and social judgment appropriate for her age and upbringing (Tr. 370.)

difficult for the child to perform independently or effectively. Medications taken for the impairments and other treatments may also have physical effects that limit the ability to perform.   If the illness is chronic but stable, the ALJ is to consider how the child functions during periods when the symptoms worsen and how often and for how long these periods occur.   Examples of limitations in the domain of health and physical well-being include generalized symptoms such as weakness, dizziness, excitability, lethargy or psychomotor retardation; somatic complaints (e.g., seizure or convulsive activity, headaches, incontinence, recurrent infections, allergies, changes in weight or eating habits, stomach discomfort, nausea, headaches, or insomnia); limitations due to treatment (e.g., chemotherapy, multiple surgeries); or exacerbations from impairment(s) which interfere with the child's physical functioning or result in a need for intensive medical care to maintain a proper level of health and physical well-being.   Whether an example applies in a particular case may depend on the child's age and developmental stage; e.g., an example may describe a limitation in an older child, but not a limitation in a younger one.   20 C.F.R. § 416.926a(l).

We agree with Plaintiff that the ALJ's analysis in this domain is somewhat less well developed than the other sections.   For instance, at no point in his decision does he discuss the Listings under which he considered Summer's irritable bowel syndrome or von

Willebrand's disease.  (Compare analysis of ADHD, depression and
speech impairment at Tr. 15.)   However, there is no requirement
that the ALJ identify or analyze the most relevant Listing (*see*
Jones v. Barnhart, 364 F.3d 501, 505 (3d Cir. 2004)), and Plaintiff
does not contend that the ALJ erred either by failing to identify
the relevant Listings or by finding that she did not satisfy a
Listing.   Second, the analysis does little more than state in
conclusory fashion that the von Willebrand's disease causes her to
bruise and bleed easily and restricts her physical activities; her
irritable bowel syndrome is described only by the fact that she
takes medication to control this impairment.   The ALJ does not cite
to specific points in the transcript for these conclusions, but
review of the medical records by this Court shows that her long-
term physicians have offered very few details in the way of
explanation or comment than those noted by the ALJ.   (*See*, e.g.,
medical records of Dr. Charles R. Calabrese, Summer's hematologist,
at Tr. 294-301, and medical records of her pediatrician Dr. Duy Ba
Nyuyen at Tr. 310-359.)  We also agree that the ALJ failed to state
his conclusions regarding the cumulative effects of these
impairments, the effects of her depression, the side effects of the
medication taken to alleviate these physical and mental impairments
and the limitations caused thereby.

We do not agree, however, that the ALJ discounted the medical
evidence of record and relied on his own opinions.  His ultimate

conclusion that Plaintiff's irritable bowel syndrome and von Willebrand's disease are well-controlled by medication is based on substantial evidence in the record. (*See*, e.g., Tr. 201, stating that the von Willebrand's disease was "not clinically severe" and that Summer had a "good response" to DDAVP testing; Tr. 299, noting that her irritable bowel syndrome was being treated with a high-fiber diet and Levsin[9] as of July 2003.)   A condition which can be controlled by medication or other treatment is not considered disabling. *See* <u>Brown v. Bowen</u>, 845 F.2d 1211, 1215 (3d Cir. 1988). Moreover, Plaintiff gives too much emphasis to Dr. Church's conclusion regarding the debilitating effects of von Willebrand's disease.   That is, he did not opine "that Plaintiff's von Willebrand's disease in and of itself is disabling," as Plaintiff asserts (Plf.'s Brief at 14), but rather that the condition "is *certainly somewhat* disabling."   (Tr. 285-286, emphasis added.) And, as noted above, Ms. Ross stated that when Summer was taking her Adderall properly, her attention problems had decreased.   In short, although the ALJ did not explicitly say so, the medical evidence is entirely consistent with his conclusion that Summer's irritable bowel syndrome, von Willebrand's disease, and ADHD were well-controlled with medication.

---

[9]   One of the many uses of levsin (hyoscomine) is to control symptoms associated with gastrointestinal disorders such as peptic ulcer disease, diverticulitis, colic, and irritable bowel syndrome. *See* www.nlm.nih.gov/medlineplus, last visited April 20, 2007.

Finally, while it is true the ALJ failed to mention the low GAF scores noted by Drs. Somen and Reich, an ALJ is not required to mention every item of medical evidence in the record. <u>Fargnoli v. Halter</u>, 247 F.3d 34, 43 (3d Cir. 2001). While a GAF score is helpful in allowing a layperson to better understand the severity of a claimant's depression, "neither the regulations nor case law requires an ALJ to determine a claimant's disability based solely on her GAF score." <u>Ramos v. Barnhart</u>, CA No. 06-1457, 2007 U.S. Dist. LEXIS 23561, *33-*34 (E.D. Pa. Mar. 30, 2007); <i>see also</i> <u>Santiago-Rivera v. Barnhart</u>, CA No. 05-5698, 2006 U.S. Dist. LEXIS 69559, *28 (E.D. Pa. Sept. 26, 2006), noting that pursuant to Social Security rules, "a claimant's GAF score is not considered to have a direct correlation to the severity requirements."

However, despite the deficiencies in the ALJ's analysis of this domain, we conclude that remand is not required. As noted above, at step three of the analysis there must be evidence to demonstrate that the child suffers from a marked limitation in two or more domains or an extreme limitation in one domain. There is no evidence to support the conclusion that Summer was extremely limited in the health and physical well-being domain and at most, argues that her limitations in this domain should be considered "marked." (Plf.'s Brief at 15.) Because we affirm the ALJ's conclusion that her limitations in the domains of attending and completing tasks  and acquiring and using information are less than

marked, Plaintiff has not satisfied this alternative method of demonstrating functional equivalence of a Listing.

Plaintiff's motion for summary judgment is denied. An appropriate order follows.


April _____25th_____, 2007                    _William L. Standish_
                                               William L. Standish
                                          United States District Judge


cc:   Barbara J. Artuso
      Quatrini, Rafferty & Galloway
      550 East Pittsburgh Street
      Greensburg, PA 15601
      Email: bja@qrglaw.com

      Megan Farrell, Esq.
      United States Attorney's Office
      700 Grant Street
      Suite 4000
      Pittsburgh, PA 15219
      Email: megan.farrell@usdoj.gov